453 F.2d 1144
 72-1 USTC P 9182
 B. FORMAN COMPANY, Inc., Petitioner-Appellee,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.
McCURDY & COMPANY, Inc., Petitioner-Appellee,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.
B. FORMAN COMPANY, Inc., Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
McCURDY & COMPANY, Inc., Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 Nos. 768-771, Dockets 35434, 35839, 71-1026, 71-1027.
 United States Court of Appeals,
Second Circuit.
 Argued June 1, 1971.
Decided Jan. 10, 1972.
 
 Ellsworth A. Van Graafeiland and Peter L. Faber, Rochester, N. Y. (Wiser, Shaw, Freeman, Van Graafeiland, Harter & Secrest, Richard B. Secrest and William M. Colby, Rochester, N. Y., of counsel), for taxpayers.
 Stephen Schwarz, Atty., Tax Div. (Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks and Harry Baum, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel), for the Commissioner.
 Before CLARK, Associate Justice,* SMITH, Circuit Judge, and ZAVATT, District Judge.**
 ZAVATT, District Judge.
 These are cross-appeals from a decision of the Tax Court, 54 T.C. 913 (1970), holding (1) that 26 U.S.C. Sec. 482 (the Internal Revenue Code of 1954, hereinafter the "Code") did not authorize the Commissioner to allocate to B. Forman Co., Inc. (Forman) and McCurdy & Co., Inc. (McCurdy) (both referred to herein as taxpayers) interest income attributable to interest free loans made by the taxpayers to Midtown Holdings Corp. (Midtown), because of the absence of the requisite Sec. 482 control of Midtown by the taxpayers; and (2) that annual payments of $75,000.00 each made by taxpayers to Midtown were not ordinary and necessary business expenses deductible under 26 U.S.C. Sec. 162. The Commissioner appeals from the first of these holdings; the taxpayers appeal from the second. We reverse the decision of the Tax Court as to the first and affirm as to the second of these holdings.
 These consolidated cases involve the corporate income tax liability of Forman and of McCurdy for the fiscal years 1965, 1966 and 1967. Having disallowed the annual payments of $75,000.00 each year by the taxpayers to Midtown and having allocated as income to each taxpayer interest at the rate of 5% per annum on a $1,000,000.00 loan made by each taxpayer to Midtown prior to the fiscal years in question, the Commissioner assessed tax deficiencies against each taxpayer (now in dispute) as follows:
 Forman McCurdy
1965 $ 62,425.55 $ 59,181.99
1966 58,775.14 59,643.92
1967 59,692.00 62,343.56
 ----------- -----------
Totals $180,892.69 $181,169.47
 Following receipt of the Commissioner's notices of these deficiencies and on January 31, 1969, each taxpayer filed a petition with the Tax Court for a review of the respective tax deficiency determinations of the Commissioner, both of which petitions were consolidated.
 For several years prior to and as of the date of incorporation of Midtown, McCurdy (a New York corporation since 1901) operated a retail general department store at 285 Main Street East, Rochester, New York and Forman (a New York corporation since 1912) operated a retail department store, specializing in men's and women's apparel, at 46 Clinton Avenue South, Rochester, New York. All of the stock of McCurdy was owned by or in behalf of members of the McCurdy family. All of the stock of Forman was owned by or in behalf of members of the Forman family. McCurdy and Forman had no common shareholders, directors or officers. Both corporations were competitors.
 In an effort to stem declining incomes, McCurdy and Forman caused Midtown to be formed in 1958. On March 23, 1959 they entered into an agreement with reference to their participation in the building and development of a midtown shopping center in Rochester which would adjoin the rear entrances to their respective stores. By that time the Board of Directors and officers of Midtown consisted of the following:
 Relationship to McCurdy and Forman
Gilbert J. C. McCurdy (President and
 Chairman of Board of Directors of and President of McCurdy
 Midtown)
Gordon W. McCurdy (Secretary and a
 Director of Midtown) Directors and Senior Vice-President
 of McCurdy
Maurice R. Forman (Vice-President and a
 Director of Midtown) and President of Forman
Fred Forman (Treasurer and a Director
 of Midtown) Senior Vice-President of Forman
Lynn Johnston (Vice-President and
 General Manager of Midtown)
 It would appear from that agreement that when, in 1958, McCurdy and Forman decided to form Midtown and erect a shopping center in downtown Rochester, they each entered into lease agreements (with options to purchase) with the owners of the property on which they contemplated the construction of the shopping center. These properties are described in the appendices to the agreement of March 23, 1959. In and by that agreement McCurdy and Forman agreed to assign and transfer to Midtown their respective interests in these leases and options and to convey title to any such property already vested.
 McCurdy and Forman had already acquired 50% each of the issued and outstanding shares of Midtown. In exchange for the real estate interests they were to assign and convey to Midtown, each of them was to receive an additional 810 common, no par value shares of Midtown, thus continuing their equal stock ownership in Midtown. If, prior to January 1, 1965, the Board of Directors of Midtown should determine, by resolution, that additional funds were necessary or advisable, McCurdy and Forman agreed to purchase additional shares of Midtown "so that their aggregate holding shall be One Million Dollars ($1,000,000) each, at any time, and from time to time . . ." In addition, each party to this agreement agreed to loan to Midtown additional amounts
 "so that their aggregate loans to Midtown shall be One Million Dollars ($1,000,000) each, at any time and from time to time, if, prior to January 1, 1965, the Board of Directors of Midtown, by resolution, shall determine that such additional funds in the form of borrowing are necessary or advisable. Loans shall be made equally by the parties.
 Such loans shall be represented by notes, or other evidence of indebtedness, of Midtown, the essential features of which shall be as follows:
 (A) The notes shall pay interest at the rate of five (5) percent per annum, payable semi-annually on the first day of January and July in each year.
 (B) The notes shall be due and payable thirty (30) years after issuance.
 (C) Midtown shall have the right to prepay the notes in whole or in part on any interest paying date prior to maturity upon the payment of the principal amount thereof and accrued interest.
 (D) The notes may be unsecured but shall not be subordinated to the claims of any other unsecured creditor of Midtown.
 (E) The notes shall be part of a series, and there shall be no preference between the parties hereto as to payment of the notes of a series."
 This agreement also provided for the control of Midtown by McCurdy and Forman by requiring each party thereto to vote its respective Midtown stock so as to provide for a Board of Directors consisting of three Directors designated by the Board of Directors of McCurdy and three Directors designated by the Board of Directors of Forman. At the request of either McCurdy or Forman, each party to the agreement undertook to vote its Midtown stock for a seventh Director. In the event they were unable to agree upon the seventh Director, McCurdy and Forman were to designate their respective representatives who would designate the seventh Director to be elected "by the parties hereto . ." In the event that these representatives were unable to agree upon a seventh Director, a Justice of the Appellate Division of the Supreme Court, Fourth Judicial Department, was to act with the two representatives and the seventh Director of Midtown was then to be designated by majority vote of the Justice and the two representatives of the parties.
 
 
 1
 The agreement also limited the right of the parties to dispose of their Midtown stock to detailed conditions set forth therein.
 
 
 2
 Although the agreement provided for the designation of three Midtown Directors each by the parties, there were only four. During all of the relevant times the officers and directors of Midtown were:
 
 
 3
 President and Director Gilbert J. C. McCurdy
Vice President and Director Maurice R. Forman
Secretary and Director Gordon W. McCurdy
Treasurer and Director Fred Forman (until his death)
 Robert Aex (after Fred Forman's death)
 Aex represented Forman's interests
Vice President and General Manager Lynn Johnston (to April 1, 1963)
 Angelo Chiarella (from May 27, 1963 on)
 
 
 4
 The shopping center, completed and opened for business in 1962, consisted of an eighteen story building, a four story building (adjoining the Mall), and a three level underground parking garage. Each taxpayer initially invested a total of $1,000,000.00 in return for Midtown stock. The original estimated cost of the shopping center was $8,000,000.00. The actual cost exceeded $18,000,000.00.
 
 
 5
 Construction commenced in 1959. The record does not reveal all of the financing for this project. It does show that Midtown entered into a building loan agreement with Lincoln Rochester Trust Company (Lincoln), dated April 18, 1961, providing for advances not to exceed $11,000,000.00 to be evidenced by notes bearing interest at the rate of six percent per year, secured by the "personal guarantees of certain officers of the Company and others" and "a conditional assignment of rents of the premises." During 1958 and 1959, McCurdy and Forman made several loans to Midtown, the amounts of which are not revealed by the record or stated in the stipulation of facts in the proceeding before the Tax Court. It was so stipulated, however, that, on May 1, 1959, the several loans were consolidated into single obligations of Midtown of $662,500.00 each to McCurdy and Forman, represented by thirty-year notes of Midtown, each bearing interest at the rate of five percent per annum. (These notes were satisfied in July of 1959, without interest, from the proceeds of a $2,700,000.00 line of credit established by Midtown with Lincoln. The fact that McCurdy and Forman each waived interest on these notes is not involved in the instant case.)
 
 
 6
 Allocation of Interest Income under 26 U.S.C. Sec. 482
 
 
 7
 The issue as to allocation of income to McCurdy and Forman for the fiscal years 1965, 1966 and 1967 stems from loans of $1,000,000.00 each by the taxpayers to Midtown on September 9, 1960, each represented by a three-year note of Midtown to each taxpayer, bearing interest at the rate of three and one-half percent per annum. These notes were cancelled in April 1961, without payment of any principal or interest. In lieu thereof, they were replaced by notes of $1,000,000.00 each, predated September 9, 1960 and bearing no interest. On their due date, September 9, 1963, they were replaced by three-year notes in the same principal amounts, bearing no interest-without any payment of principal or interest having been made thereon. These notes, dated September 9, 1963, were replaced on September 9, 1966 by three-year notes in the same amounts, bearing no interest, without any payment of principal or interest having been paid thereon. No payments of principal or interest have ever been made on the notes dated, respectively, September 9, 1960, September 9, 1963 and September 9, 1966. The issue as to the Commissioner's allocation of income to McCurdy and Forman relates to the notes dated September 9, 1963 and September 9, 1966.
 
 
 8
 The Commissioner imputed interest income at the rate of five percent per annum on those $1,000,000.00 loans by McCurdy and Forman to Midtown ($50,000.00 of income to each taxpayer during their fiscal years 1965, 1966 and 1967), pursuant to 26 U.S.C. Sec. 482, which provides:
 
 
 9
 "482. Allocation of income and deductions among taxpayers
 
 
 10
 In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."
 
 
 11
 The Tax Court reversed the Commissioner's determination, holding in effect that Midtown was not "controlled directly or indirectly" by either McCurdy or by Forman and that McCurdy and Forman may not be regarded as a single entity controlling Midtown.
 
 
 12
 "The clear language of section 482 requires that there be two business entities with respect to which direct or indirect control by the same interests can be found. If we look at Midtown and Forman's or Midtown and McCurdy's, no such control existed. To import a common objective test into section 482, and thereby create a theoretical partnership between Forman's and McCurdy's, would require an unwarranted elasticized reading of the statutory language." 54 T.C. at 923.
 
 Legislative History
 
 13
 26 U.S.C. Sec. 482 derives from section 45 of the Internal Revenue Code of 1928. The House report with reference to section 45 of the 1928 Code explained that its purpose was to allow the Commissioner to
 
 
 14
 "distribute the income or deductions between or among [commonly controlled taxpayers] . . ., as may be necessary in order to prevent evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking'), and in order clearly to reflect their true tax liability." H.Rep.No. 2, 70th Cong., 1st Sess., pp. 16-17 (1939-1 Cum.Bull. Part 2 384, 395).
 
 
 15
 Provisions somewhat similar to those in section 45 were contained in prior Revenue Acts. Section 240(d) of the Revenue Act of 1924, 43 Stat. 288, Internal Revenue Acts of 1924 to Date, 26 U.S.C.A. p. 45, authorized the Commissioner to consolidate the accounts of two or more related trades or businesses owned or controlled by the same interests. It did not authorize him to distribute, apportion, or allocate, as in section 482. Section 240(f) of the Revenue Act of 1926, 44 Stat. 46, Internal Revenue Acts of 1924 to Date, 26 U.S.C.A. p. 191 contained the very same language as in section 240(d) of the Revenue Act of 1924. Section 45 of the Revenue Act of 1928, 45 Stat. 806, Internal Revenue Acts of 1924 to Date, 26 U.S.C.A. p. 364, effected a change. The sections of the prior acts were under the caption "Consolidated Returns of Corporations." The caption of section 45 of the Revenue Act of 1928 was "Allocation of Income and Deductions." Its language is substantially identical to that in present section 482. The same is true of section 45 of the Revenue Act of 1932, 47 Stat. 186, Internal Revenue Acts 1924 to Date, 26 U.S.C.A. p. 498; section 45 of the Revenue Act of 1934, 48 Stat. 695, Internal Revenue Acts of 1924 to Date, 26 U.S.C.A. p. 680; section 45 of the Revenue Act of 1936, 49 Stat. 1667, Internal Revenue Acts of 1924 to Date, 26 U.S.C.A. p. 840; section 45 of the Revenue Act of 1938, 52 Stat. 474, Internal Revenue Acts of 1924 to Date, 26 U.S.C.A. p. 1028 and section 45 of the Internal Revenue Code of 1939, 26 U.S.C.A. Sec. 45; the Internal Revenue Code of 1954, section 482. The Revenue Act of 1928 eliminated the right of affiliated corporations to file consolidated returns and the right of the Commissioner to consolidate the accounts of two or more related trades or businesses controlled by the same interests. In lieu thereof section 45 was inserted which "broadened considerably" former section 240(f) of the 1926 Act "in order to afford adequate protection to the Government made necessary by the elimination of the consolidated return provisions of the 1926 Act." National Securities Corp. v. Commissioner of Internal Revenue, 137 F.2d 600, 602 (3d Cir.), cert. denied, 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 479 (1943); H.R. 2, 70th Cong., 1st Sess.
 
 Lake Erie
 
 16
 The decision of the Tax Court in Lake Erie & Pittsburg Railway Co. v. Commissioner, 5 T.C. 558 (1945), is the only judicial determination based on facts substantially similar to those in the instant case. The Tax Court reaffirmed that decision in the instant case. In Lake Erie, the New York Central Railroad and the Pennsylvania Railroad (two independent competing corporations, having no common stockholders, officers or directors), formed a third corporation, the Lake Erie & Pittsburg Railway Co. (Lake Erie), for the purpose of acquiring, building, maintaining, leasing and operating a railroad between Lorain and Youngstown, Ohio. New York Central and Pennsylvania railroads were the sole, equal stockholders of Lake Erie. They used the facilities of Lake Erie for which use they originally paid rent pursuant to a 1908 agreement and Lake Erie paid dividends to these two stockholders. This agreement was modified in 1939 so as to release the two railroads from their obligation to pay rent to Lake Erie and release Lake Erie of its obligation to pay them (as stockholders) dividends. The Commissioner allocated to Lake Erie as income to it, during 1937, 1938, 1939 and 1940, from the gross income of the railroads an amount equal to the rent which the railroads were originally obligated to pay to Lake Erie. Lake Erie had reported no taxable net income for each of these years. The Tax Court reversed the determination of the Commissioner on the ground that he was without authority to make the questioned allocation pursuant to section 45 of the Internal Revenue Code of 1939:
 
 
 17
 "The stockholders of the New York Central are not the 'same interests' as the stockholders of Pennsylvania and neither the New York Central nor the Pennsylvania has control of the petitioner. Together they do have. But that amounts to saying nothing more than that the stockholders of a corporation control it. We do not think that it can be said that where two or more corporations owned by different sets of stockholders control another corporation such other corporation is controlled by the same interests." 5 T.C. at 564-565.
 
 
 18
 The Commissioner acquiesced in the decision of the Tax Court in Lake Erie. 1945 Cum.Bull. 5. In 1965, however, the Commissioner withdrew the prior acquiescence and substituted nonacquiescence. Rev.Rul. 65-142, 1965-1 Cum.Bul. 223.
 
 
 19
 The declared purpose of section 482 is "to prevent evasion of taxes or clearly to reflect the income of . . . organizations . . . owned or controlled directly or indirectly by the same interests." This legislative purpose is reflected in the Treasury Regulations where it is stated that:
 
 
 20
 "The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer . . . . The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer . . .. Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes." Treas. Reg. Sec. 1.482-1(b) (c)
 
 
 21
 The courts recognize the congressional purpose of section 482 to prevent evasion or avoidance of otherwise payable taxes by means of shifting profits or by other financial devices and have given broad scope to the Commissioner's discretion in making reallocations of income, where the exercise of this power is not unreasonable or arbitrary. W. Braun Co. v. C.I.R., 396 F.2d 264, 266 (2d Cir. 1968). Similar recognition was given to section 45 of the Revenue Act of 1928. Central Cuba Sugar Co. v. Commissioner of Internal Revenue, 198 F.2d 214, 216 (2d Cir.), cert. denied, 344 U.S. 874, 73 S.Ct. 167, 97 L.Ed. 677 (1952). The courts have also construed this statute liberally in order to achieve the declared purpose of Congress. In Asiatic Petroleum Co. v. Commissioner of Internal Revenue, 79 F.2d 234 (2d Cir.), cert. denied, 296 U.S. 645, 56 S.Ct. 248, 80 L.Ed. 459 (1935), it was held that the phrase "evasion of taxes" in section 45 of the Revenue Act of 1928 "is broad enough to include the avoidance of the realization for taxation of such a profit through its transfer to another branch of the same business enterprise in a way which only changes its place in the business set up." 79 F.2d at 236. The court also gave a broad meaning to the term "gross income" in section 45. It referred to the progress of section 45 of the Revenue Act of 1928 in support of its liberal interpretation of that statute. 79 F.2d at 236. See also, Advance Machinery Exchange v. Commissioner of Internal Revenue, 196 F.2d 1006 (2d Cir.), cert. denied, 344 U.S. 835, 73 S.Ct. 45, 97 L.Ed. 650 (1952).
 
 
 22
 Whether the Commissioner was correct in allocating to McCurdy and Forman interest on their respective loans of $1,000,000.00 each is essentially one of fact, and his decision must be affirmed if supported by substantial evidence. Advance Machinery Exchange, supra, at 1007. Where, as here however, the Tax Court has reversed the Commissioner, the decision of the Tax Court must be affirmed unless clearly erroneous. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Schley v. Commissioner of Internal Revenue, 375 F.2d 747 (2d Cir. 1967); LaMont v. Commissioner of Internal Revenue, 339 F.2d 377 (2d Cir. 1964). In order to justify an allocating of income pursuant to section 482, the Commissioner must find that (1) there are two or more trades, businesses or organizations (2) owned or controlled by the same interests and (3) that it is necessary to allocate gross income, deductions, credits, or allowances among them in order to prevent evasion of taxes or in order to clearly reflect their income.
 
 Treasury Regulations
 
 23
 Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes. Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948); Sanford v. Commissioner of Internal Revenue, 412 F.2d 201, 202 (2d Cir.), cert. denied, 396 U.S. 841, 90 S.Ct. 104, 24 L.Ed.2d 92 (1969).
 
 Organization
 
 24
 The terms "organization," "trade," "business" are broadly defined in Treas.Reg. Sec. 1.482-1(a) (1) and (2). In Borge v. Commissioner of Internal Revenue, 405 F.2d 673 (2d Cir. 1968), cert. denied, sub nom, Danica Enterprises, Inc. v. Commissioner of Internal Revenue, 395 U.S. 933, 89 S.Ct. 1994, 23 L.Ed.2d 448 (1969), this court found that an individual stockholder and his wholly owned corporation satisfied the two or more business prerequisite of section 482. Certainly, Midtown, McCurdy and Forman satisfy this prerequisite.
 
 Control
 
 25
 No definition of "control" is contained in section 482. It has been opined that this omission was intentional in order to allow for flexibility of administration. Plumb and Kapp, Reallocation of Income and Deductions Under Section 482, 41 Taxes 808, 811 (1963).
 
 
 26
 Guidelines for determining control are contained in Treas.Reg. 1.482-1(a) (3):
 
 
 27
 "The term 'controlled' includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted."
 
 
 28
 To the same effect see Treas.Reg. 39.45-1(a) (3) and annual Treasury regulations thereafter.
 
 
 29
 As to "same interests," there is no statutory definition and no Treasury regulations guidelines.
 
 
 30
 In order to find control, no percentage requirements are specified nor are any precise requirements necessary. The trend in the recent case law is to apply the realistic approach. Borge v. Commissioner of Internal Revenue, supra; Hall v. Commissioner, 32 T.C. 390 (1959), aff'd, 294 F.2d 82 (5th Cir. 1961); Grenada Industries, Inc. v. Commissioner, 17 T.C. 231 (1951), aff'd 202 F.2d 873 (5th Cir.), cert. denied, 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345 (1953). Despite the fact that these cases are all distinguishable on their facts, they lend support to the view that the Commissioner urges here.
 
 
 31
 In Borge v. Commissioner of Internal Revenue, supra, this Court held that an individual (the entertainer Victor Borge) and his wholly owned corporation, conducting a poultry business, were commonly controlled within the purview of Sec. 482 and that the Commissioner was justified in allocating income from the corporation to Victor Borge, because the contract between him and his wholly owned corporation would never have been made between two unrelated parties dealing at arm's length.
 
 
 32
 In Hall v. Commissioner, supra, the taxpayer (Hall) conducted a business individually. Thereafter he formed a corporation and transferred nearly all of his shares of stock of that corporation to his son. The court upheld the allocation of income between Hall and the corporation under Sec. 45 of the 1939 Code. It disregarded the issue of who actually owned the stock, holding that Hall, in fact, actively controlled the corporation, despite his contention that he had transferred ownership of the stock. The Tax Court, in Ach v. Commissioner, 42 T.C. 114 (1964), aff'd, 358 F.2d 342 (6th Cir.), cert. denied, 385 U.S. 899, 87 S.Ct. 205, 17 L.Ed.2d 131 (1966), restated its view that it is not the record ownership of stock which determines control; that control is to be determined by ascertaining who, in fact, has control.
 
 
 33
 In Grenada Industries, Inc. v. Commissioner, supra, two corporations and two partnerships were owned by four families in identical 35%-35%-20%-10% proportions. In upholding an allocation of income among the four organizations, the court noted that it was immaterial that the record ownership of the stock and the partnership interests may not have been in the identical persons at the same time. Control was inferred from the actions of the parties.
 
 
 34
 If Midtown was the creature of only one of the taxpayers, and all of its stock were owned by that single parent, i. e., if Midtown were a strange creature having a father but no mother, the most rigid, literal wooden interpretation of section 482 would bring Midtown within the ambit of that section. It is the contention of the taxpayers, however, that section 482 is not applicable because Midtown is the normal child of a father and a mother, the product of an earthy relationship between McCurdy and Forman, twentieth century parents exercising no control over their progeny.
 
 
 35
 Midtown is the creation of a union of McCurdy and Forman-not in holy matrimony but in a legitimate business enterprise. Their interests in the existence and career of Midtown and the interests of Midtown are identical.
 
 
 36
 To contend that these parents do not control their child is to fly in the face of reality. They have had complete control of Midtown from the day of conception (its incorporation) throughout the years relevant to this case. Every act of Midtown has been dictated by papa and mamma who, directly or indirectly, have financed its career and controlled its every move.
 
 
 37
 In apparent disregard of the reality of the circumstances, the Tax Court below looked only to the record ownership of Midtown. Ignored was reality of the control of Midtown. In withdrawing his acquiescence in Lake Erie, the Commissioner concluded that Lake Erie was inconsistent with the broad language of Sec. 482 and the trend of cases discussed supra, and noted that Lake Erie ignored the reality of the control in that case.
 
 
 38
 The Commission is supported by the views of commentators.[1]
 
 
 39
 The loans by taxpayers to Midtown, without interest, affected the incomes of taxpayers and of Midtown. By not reporting interest on these loans, taxpayers reported lower earnings and, in turn, lower taxes. Midtown, in not paying interest, eliminated a business expense which would have further increased its yearly losses. Because of Midtown's unfavorable financial condition, it was encountering difficulty in the rental of stores, a matter of concern to McCurdy and Forman, the actual owners of Midtown. Midtown, McCurdy and Forman were loathe to show as further losses annual interest payments on $2,000,000.00 of loans at 5% i. e., $100,000.00 per year, and the elimination of annual payments of $150,000.00 by McCurdy and Forman. Reference to these payments will be made infra. Mr. Chiarella, general manager of Midtown, testifying before the Tax Court as to these annual payments of $150,000.00, said that they definitely helped to narrow Midtown's deficit; that without these payments Midtown would have had to get that money from some place. Appendix p. 280a. This explanation is equally applicable to the waiver of interest on the loans aggregating $2,000,000.00.
 
 
 40
 Whether McCurdy and Forman are regarded as a partnership or joint venture, de facto, in forming Midtown, the conclusion is inescapable that they acted in concert in making loans without interest to a corporation, all of whose stock they owned and all of whose directors and officers were their alter egos. They were not competitors in their dealings with one another or with Midtown as to Midtown. Their interests in Midtown were identical. When the Commissioner withdrew his acquiescence in Lake Erie, he gave reality of control as one of the reasons for doing so. "[T]he reality of control by the same interests is present no less than if they [the two parent railroads] had formed a partnership . . . to deal with the petitioner [Lake Erie Railway Company] or had formed another corporation to deal with petitioner." Rev.Rul. 64-142. We agree.
 
 
 41
 We find clearly erroneous the holding of the Tax Court that the requisite control of Midtown by the taxpayers was not present and find further that McCurdy and Forman had the same interests in Midtown.
 
 
 42
 Having found two businesses under common control, we reach the question as to whether the Commissioner properly allocated interest on the two loans of $1,000,000.00 each as income to the taxpayers.
 
 
 43
 "Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes." Treas.Reg. 1.482-1(c). To same effect, see Local Finance Corp. v. Commissioner of Internal Revenue, 407 F.2d 629, 632 (7th Cir.), cert. denied, 396 U.S. 956, 90 S.Ct. 428, 24 L.Ed.2d 420 (1969). To justify the allocation as income to McCurdy and Forman of interest on their loans, it must be found that their waiver of interest "is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another controlled taxpayer." Treas.Reg. 1.482-1(c). See also, Local Finance Corp. v. Commissioner of Internal Revenue, supra, at 632; Lilly and Co. v. United States, 372 F.2d 990, 1000 (Ct.Cl.1967); Oil Base, Inc. v. Commissioner of Internal Revenue, 362 F.2d 212, 214 (9th Cir.), cert. denied, 385 U.S. 928, 87 S.Ct. 287, 17 L.Ed.2d 211 (1966). "In determining the true taxable income of a controlled taxpayer, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances." Treas. Reg. 1.482-1(c).
 
 
 44
 Reallocation is necessary here in order to properly reflect the income of taxpayers and Midtown. Taxpayers have advanced an argument, supported by case law, that the Commissioner may not create income where none actually existed. In Tennessee-Arkansas Gravel Co. v. Commissioner of Internal Revenue, 112 F.2d 508 (6th Cir. 1940), the court held that the Commissioner could not increase the income of a taxpayer whose property had been used by a related corporation without the payment of rent. The court concluded that, since no rent was called for, none could be created. In Smith-Bridgman & Co. v. Commissioner, 16 T.C. 287 (1951), the Commissioner had added interest to the taxable income of Smith-Bridgman & Co., as allegedly constituting interest which should have been charged by it on noninterest bearing loans to its parent corporation, Continental Department Stores (Continental). Taxpayer did not report as income any interest on these loans. The Tax Court, in overruling the Commissioner, who had allocated interest to Smith-Bridgman, refused to authorize the creation of income where no income was realized. This decision was thought to rest on the fact that the Commissioner had added interest to taxpayer, but had failed to make an adjustment to the income of Continental. However, the rationale of Smith-Bridgeman was clarified in Huber Homes, Inc. v. Commissioner, 55 T.C. 598 (1971), where it was held that the failure to make the adjustment was only a possible supporting factor, not a controlling factor. Smith was reaffirmed in PPG, Industries, Inc. v. Commissioner, 55 T.C. 928 (1970), where the Tax Court held that Sec. 482 did not authorize the Commissioner to impute interest on non-interest bearing loans where in fact no interest was created.
 
 
 45
 Several cases have held that one related party is not required to charge another related party interest on a loan; that the lender is not to be taxed on interest, with respect to a loan, where it was not intended that interest be collected. In Combs Lumber Co. v. Commissioner, 41 B.T.A. 339 (1940), it was the practice of the corporation to lend money to its stockholders without interest. The Board of Tax Appeals ruled that, under the circumstances, no liability for interest was created and, thus, the Commissioner could not impute interest to the lender. In Society Brand Clothes, Inc. v. Commissioner, 18 T.C. 304 (1952), a corporation held a ten year note of its wholly owned subsidiary. The note provided for the payment of interest, but it was executed with the understanding that no interest would be charged until some date in the future. The Tax Court held that the corporation was not required to report any interest not received by it. A similar result was reached in Atchison, Topeka & Sante Fe Railway Co. v. Commissioner, 36 T.C. 584 (1961).
 
 
 46
 To the extent that the above cases cited by taxpayers may be read as holding that no interest can be allocated under Sec. 482 under the facts of this case, they are not in accord with either economic reality, or with the declared purpose of section 482. They seriously impair the usefulness of Sec. 482. Those cases may be correct from a pure accounting standpoint. Nevertheless, interest income may be added to taxpayers' incomes, as long as a correlative adjustment is made to Midtown, for then the true taxable income of all involved will be properly reflected. Treas.Reg. Sec. 1.482-1(a) (6) provides:
 
 
 47
 "The term 'true taxable income' means . . . the taxable income . . . which would have resulted to the controlled taxpayer, had it in the conduct of its affairs . . . dealt with the other member . . . at arm's length. It does not mean the income . . . or allowances, resulting to the controlled taxpayer by reason of the particular . . . transaction . . the controlled taxpayer . . . chose to make (even though such . . . transaction . . . may be legally binding upon the parties thereto)."
 
 Treas.Reg. Sec. 1.482-2(a) provides:
 
 48
 "Where one member of a group of controlled entities makes a loan or advance directly or indirectly to, or otherwise becomes a creditor of, another member of such group, and charges no interest . . . the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan . . ."
 
 
 49
 These regulations must prevail, for they are entirely consistent with the scope and purpose of Sec. 482. The instant loans without interest are obviously not at arm's length, since no unrelated parties would loan such large sums without interest. The allocation of the interest income to taxpayers was necessary in order to properly reflect their taxable incomes.
 
 
 50
 Taxpayers contend that the $1,000,000.00 loans were not in fact loans; that they were contributions to capital. This argument is completely without merit. The terms of the loans plus the terms of the 1959 Agreement, specifying the creation of $1,000,000.00 loans, leave no doubt that the parties intended to and did treat these transactions as loans. Further, there is no evidence in the record that the taxpayers received additional stock of Midtown for these alleged capital contributions.
 
 
 51
 Our remaining concern is with whether the allocation of interest at 5 percent was proper. The Tax Court in its decision did not reach this issue. A remand is not necessary because, under both the regulations and the circumstances of this case, the 5% interest charge was eminently reasonable. Treas.Reg. 1.482-2(a) (2) provides the standard for determining the appropriate interest to be charged:
 
 
 52
 "For the purposes of this paragraph, the arm's length interest rate shall be the rate of interest which . . . would have been charged at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.
 
 
 53
 . . . If the creditor was not regularly engaged in the business of making loans or advances of the same general type as the loan or advance in question to unrelated parties, the arm's length rate for purposes of this paragraph shall be-
 
 
 54
 (i) The rate of interest actually charged of at least 4 but not in excess of 6 percent per annum simple interest,
 
 
 55
 (ii) 5 percent per annum simple interest if no interest was charged or if the rate of interest charged was less than 4, or in excess of 6 per cent per annum simple interest,
 
 
 56
 unless the taxpayer establishes a more appropriate rate . . ."
 
 
 57
 Midtown's balance sheets reveal that it paid interest on various loans, ranging from 4 and 1/2% to 6% per annum. (See for example pp. 97, 106, 109, 112, 133 and 166 of the Exhibit file.) Midtown had outstanding loans from Lincoln Rochester Trust Co. payable at 5 and 1/2% interest; from Central Trust Co. payable at 5 and 1/2% per annum and from D. Raffelson payable at 5% per annum. Considering the rate of interest Midtown paid on its arm's length loans and the Treasury Regulations, 5% is an appropriate rate of interest.
 
 
 58
 This Court finds that the reversal by the Tax Court of the determination of the Commissioner allocating to the taxpayers interest income at 5% on their respective loans of $1,000,000.00 to Midtown is clearly erroneous.
 
 
 59
 The annual payments of $75,000.00 each by McCurdy and Forman
 
 
 60
 to Midtown
 
 
 61
 The initial plans for the enclosed mall shopping center (Midtown Plaza) contemplated kiosks in the southern portion of the mall (South Mall) and the northern portion thereof (North Mall). Midtown constructed and rented four kiosks in the South Mall. No more than three of these kiosks were rented and occupied at one time. No kiosks were erected in the North Mall, although "utility pits" for future kiosks in the North Mall were completed so that, if kiosks were erected there in the future, they could be readily connected to utilities. The Tax Court found that, at some time after the original plan to erect kiosks in the North Mall, Midtown decided not to do so but, rather, to preserve the North Mall space (180 feet by 110 feet with twice the square footage of the South Mall) for non-commercial events. The record amply supports this finding. The North Mall, with its fountain and permanent exhibit known as the "Clock of Nations," was a focal point of Midtown Plaza, used for numerous non-commercial activities which attracted considerable publicity.
 
 
 62
 At the hearing before the Tax Court, Angelo Chiarella (Chiarella), employed by Midtown as its General Manager, pursuant to a written contract of employment, testified that it was his suggestion that kiosks be erected in the North Mall. His contract of employment provided that he was to serve as General Manager of Midtown "under the general supervision and direction of the President of the Corporation and with such duties as may be reasonably assigned to him by the President of the Corporation and by its Board of Directors . . ." Entrance to the stores of both taxpayers was available from this mall and display windows of each store were visible from that mall. After Chiarella had discussed his idea (that kiosks be so erected and rented) with Gilbert J. C. McCurdy (President and Chairman of the Board of Directors of Midtown and also President and Chairman of the Board of Directors of McCurdy) and with Maurice R. Forman (Vice-President and a Director of Midtown and also President and Chairman of the Board of Directors of Forman), Chiarella wrote identical letters to McCurdy and Forman, each dated May 7, 1964, which he signed as a Vice-President of Midtown. The gist of these letters was that Midtown was losing rental income by complying with the requests of McCurdy and Forman that no kiosks be erected in the North Mall; that McCurdy and Forman derived numerous benefits from the absence of kiosks in the North Mall; that Midtown could erect and rent ten kiosks in the North Mall and thereby increase its annual rental income by $150,000.00; that in lieu thereof, McCurdy and Forman should each pay $75,000.00 per annum to Midtown for its continued compliance with the requests of McCurdy and Forman that no kiosks be erected in the North Mall.
 
 
 63
 On October 27, 1964, Midtown (by Chiarella, Vice-President) made a written offer to Gilbert J. C. McCurdy, Chairman of the Board of McCurdy, and Maurice R. Forman, President of Forman, that Midtown would accede to the said wishes of McCurdy and Forman and would not conduct any promotional events or rent the North Mall for any events or displays that would be conducted in a manner to distract from the esthetic dignity of McCurdy and Forman, in consideration of the payment by each of them of the sum of $75,000.00 per year commencing February 1, 1964. Each taxpayer accepted this offer on November 6 1964, McCurdy, by the Chairman of the Board; Forman, by its President. It would appear that there was a studied avoidance of any signature to this Midtown offer by any officer or director holding stock in Midtown. Nevertheless, it is obvious from the terms of his employment contract that he signed this Midtown offer pursuant to the direction of the President of Midtown and that the offer was made with the knowledge and/or subsequent consent of the Board of Directors of Midtown. In effect, of course, McCurdy and Forman (as owners of Midtown and of the taxpayer stores) were dealing with one another at less than an arm's length transaction. McCurdy and Forman had the power to prevent the erection of kiosks by Midtown (its controlled entity) in the North Mall.
 
 
 64
 McCurdy and Forman each paid $75,000.00 to Midtown during their fiscal years 1965, 1966 and 1967 or a total of $225,000.00 each. They deducted these annual payments as ordinary and necessary business expenses paid during each taxable year in carrying on their respective businesses. 26 U.S.C. Sec. 162(a). The taxpayers took the position that absence of kiosks in the North Mall was responsible for substantial benefits which "more than justified the expense involved"; that kiosks in the North Mall would have obstructed the visibility of their display windows; that they would have siphoned off "impulse shoppers"; would have created a "crass commercial atmosphere" inconsistent with their status as "quality" stores; that they would have taken up so much space that it would have been impossible for Midtown to hold the special events which were held in the mall, e. g., charity balls, scientific exhibits, dinners, etc.; that the holding of such events was a form of advertising by Forman and McCurdy, which would have been prevented if the kiosks were erected; that they regarded these annual payments of $75,000.00 as rental payments, in the sense that these payments insured that the mall area surrounding their stores would not be used in a "detrimental manner." The taxpayers assert that, during the period from the opening of Midtown Plaza through the taxable years at issue, McCurdy's annual sales increased by 5.2 million dollars and Forman's sales increased by 40% and they attribute these increases to "the presence of Midtown Plaza and its Mall." Thus they took the position that these annual payments were deductible as ordinary and necessary business expenses.
 
 
 65
 The Commissioner disallowed these deductions. The Tax Court affirmed the determinations of the Commissioner. It found that these "Kiosk-Prevention Payments" were not ordinary and necessary business expenses, but, rather, "disguised capital contributions and therefore not deductible expenses," 54 T.C. at 926; that "[a]t least by April 10, 1962, when Midtown Plaza opened for business, Midtown had made a firm decision not to construct and rent kiosks on the North Mall and such decision continued in full force and effect during all the periods relevant herein," 54 T.C. at 921;
 
 
 66
 "that the arrangements were not what they purport to be . . .
 
 
 67
 (1) The fact that petitioner's payments to Midtown were equal is highly suggestive. Petitioners' sales volumes and income differed markedly. The effect upon the revenue of their department stores of the North Mall activities would almost certainly be different. If the decision to keep kiosks off the North Mall had been made in connection with the department store businesses of petitioners, it would seem that the petitioner who could expect to reap a lesser benefit from the advertising would have demanded that payment be proportional to its expected benefit. Moreover, we note that none of Midtown's tenants were asked to make such payments, although they benefited from the promotional events. Finally, the original agreement between petitioners required that their investment be equal. Thus, the equality of payments suggests that they were intended as capital contributions.
 
 
 68
 (2) There were good reasons for artificially inflating Midtown's income at the expense of the department store businesses. Midtown needed cash; petitioners therefore had to make capital contributions or loans to Midtown. Petitioners had substantial taxable income against which deductions could be used, Midtown had substantial tax losses to soak up increases in income, and Chiarella's bonus would be increased by increased rental income. To the extent that a capital contribution could be disguised as income to Midtown and business expense to the petitioners, everybody benefited and no one was hurt significantly. While tax avoidance may be a permissible objective where the substance and form of the transaction coincide, the presence of a pattern of tax benefits certainly constitutes a yellow caution signal on our road to decision."
 
 
 69
 Cf. Schultz, 50 T.C. 688, 694 (1968), affirmed per curiam 420 F.2d 490 (C.A.3, 1970).
 
 
 70
 "We again emphashize that we are not dealing with a situation where the payment in question is for a benefit conferred which the payor was concerned it might lose through bona fide action by the payee."
 
 
 71
 The record fully warrants the Tax Court's conclusion that the annual payments made by the taxpayers to Midtown were not ordinary and necessary expenses deductible under 26 U.S.C. Sec. 162. The determination of whether or not a payment constitutes an ordinary and necessary business expense is, in most instances, a question of fact. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943); Chenango Textile Corp. v. Commissioner of Internal Revenue, 148 F.2d 296 (2d Cir. 1945). The Tax Court's findings must be sustained unless clearly erroneous. Commissioner of Internal Revenue v. Duberstein, supra; Schley v. Commissioner, 375 F.2d 747 (2d Cir. 1967); Lamont v. Commissioner, 339 F.2d 377 (2d Cir. 1964). The standard to be used in applying this rule is:
 
 
 72
 "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 73
 The record shows, as the Tax Court so found, that:
 
 
 74
 (1) No kiosks were contemplated by Midtown in the North Mall at the time the agreement between taxpayers and Midtown was entered into. Even if kiosks were contemplated, taxpayers by controlling Midtown could have prevented the erection and rental of kiosks in the North Mall.
 
 
 75
 (2) The use of the North Mall for non-commercial activities was preferable to obtaining kiosk rentals.
 
 
 76
 (3) Only one of Midtown's tenants had bargained for a lease provision prohibiting the erecting of kiosks.
 
 
 77
 (4) The taxpayers payments were disguised capital contributions to Midtown.
 
 
 78
 The substance of the expense, not its legal form, controls its deductibility under Sec. 162. Interstate Transit Lines v. Commissioner of Internal Revenue, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943); Deputy v. DuPont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940); Lots, Inc. v. Commissioner, 49 T.C. 541 (1968). Thus, the characterization of the expense by taxpayers as being either for advertising or for rent is not determinative. The payment in question is to be judged in light of all the terms and conditions of the agreement establishing the obligation to pay and all the facts and circumstances existing at the time the agreement was made. The fact that the taxpayer is contractually bound to make the payment does not render it an ordinary expense. Interstate Transit Lines v. Commissioner of Internal Revenue, supra; Swed Distributing Co. v. Commissioner of Internal Revenue, 323 F.2d 480 (5th Cir. 1963); Atlantic Monthly Co. v. Commissioner, 5 T.C. 1025 (1945). Considering the close relationship between taxpayers and Midtown, the payments to prevent the building of the kiosks must be subject to close scrutiny. Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940); Darco Realty Corp. v. Commissioner of Internal Revenue, 301 F.2d 190 (2d Cir. 1962); Ingle Coal Corp. v. Commissioner of Internal Revenue, 174 F.2d 569 (7th Cir. 1949). The identity of interests between the officers, directors and stockholders of taxpayers and of Midtown renders the transaction one of less than at arm's length. Ray's Clothes v. Commissioner, 22 T.C. 1332 (1959). The evidence bearing on the transaction must be scrutinized to determine the true character of the agreement and whether it would have been entered into were the taxpayers and Midtown dealing at arm's length. In Place v. Commissioner, 17 T.C. 199 (1951), aff'd, 199 F.2d 373 (6th Cir. 1952), cert. denied, 344 U.S. 927, 73 S.Ct. 496, 97 L.Ed. 714 (1953), a businessman voluntarily increased his rental payments to his lessor, his wife. The Court disallowed the deduction of the additional rent as a business expense, holding that the increased sum was not paid as rent, that it was paid under the guise of rent. The close relationship between the parties and the lack of arm's length dealing made the increase an attempt to avoid taxes. The test for determining deductibility is whether a hard-headed businessman, under the circumstances, would have incurred the expense. 4A Mertens Law of Federal Income Taxation Sec. 25.09, p. 50. Application of this test amply supports the Tax Court's findings and conclusions with respect to the deductibility of the kiosk payments. No hard headed businessmen would have incurred this extra, annual expense of $75,000.00. The deductibility of these annual payments is not allowable if the obligation to pay is in essence a camouflaged assignment of income. Audano v. United States, 428 F.2d 251 (5th Cir. 1970). Payments to discharge obligations so created are not ordinary and necessary. Audano, supra; Van Zandt v. Commissioner of Internal Revenue, 341 F.2d 440 (5th Cir. 1965), cert. denied, 382 U.S. 814, 86 S.Ct. 32, 15 L.Ed.2d 62 (1965). Forman and McCurdy both had substantial tax benefits as a result of treating their respective payments of $75,000.00 per year as deductible expenses, while Midtown received working capital with which to offset its continuing losses.
 
 
 79
 Taxpayers relied on two cases in support of their contention that the $75,000.00 annual payments by each of them were deductible. Neither Hamlin Trust v. Commissioner, 19 T.C. 718 (1953), aff'd, 209 F.2d 761 (10th Cir. 1954), nor Ullman v. Commissioner, 29 T.C. 129 (1957), aff'd, 264 F.2d 305 (2d Cir. 1959), relied upon by the taxpayers, is applicable. Both of these cases involved covenants not to compete, which were reached as a result of arm's length negotiations which clearly distinguish them from the instant case.
 
 
 80
 We hold that the finding of the Tax Court, that the annual payments by the taxpayers to Midtown were capital contributions-not rent or business expenses, was not clearly erroneous.
 
 
 81
 We affirm the Tax Court's decision that these annual payments were not deductible as ordinary and necessary business expenses. We reverse the Tax Court decision that the Commissioner was without authority to allocate to the taxpayers interest income on their non-interest bearing loans to Midtown and remand to the Tax Court for such allocation.
 
 
 
 *
 Retired Associate Justice of the Supreme Court, sitting by designation
 
 
 **
 Senior District Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 James O. Hewitt is of the view that the two railroads in Lake Erie acted in concert and controlled the Lake Erie Railway Company
 "It would seem that the court based its determination upon an unduly restricted interpretation of the phrase 'controlled directly or indirectly by the same interests.' The Tax Court could have found this section applicable by reasoning that although neither the New York Central nor the Pennsylvania Railroad alone had control of the taxpayer corporation, together they controlled the taxpayer by virtue of their agreement to manipulate the price charged for the use of taxpayer's facilities. Although the New York and Pennsylvania Railroads were normally competitors, in their joint use of taxpayer's railroad facilities they might be treated as partners. Transactions between a partnership and a related corporation have been held subject to the provisions of Section 482. [Grenada, supra] By agreeing to lower rentals to be paid to the taxpayer they were acting in concert, . . . the court may have held that there was an exercise of 'control directly or indirectly by the same interests."' Hewitt, Section 482-Allocation of Income and Control among Related Taxpayers, N.Y.U. 20th Inst. on Fed. Tax. 463, 472-73 (1962).
 As to the opinion of the court in Lake Erie that common control was negated because the two parent corporations had separate and independent shareholders, Hewitt made the following comment in a subsequent article:
 "This seems to be fallacious reasoning. One can hardly maintain that the two railroads were competing with regard to the services of the taxpayer since they were in concert manipulating the price charged for the taxpayer's facilities. . . . [I]t would seem difficult to apply on a mechanistic basis any percentage to determine if control exists. Control may be determined to be the power to direct operations of the company, or establish policy for the organization . . . so that any percentage application would be inconsistent with the definition of control." Hewitt, Section 482-Allocation of Income and Deductions Between Related Persons-Up to Date, N.Y.U. 22d Inst. on Fed.Tax. 381, 384-85 (1964).
 The authors of an article, "Reallocation of Income and Deductions Under Section 482," in 41 Taxes 809, 812 (1963), commented on the decision in Lake Erie as follows:
 "Lake Erie & Pittsburg Railway Co. v. Commissioner held that control by the same interests did not exist since each parent was controlled by its own set of stockholders which was not the same as the combined set of stockholders who indirectly controlled the subsidiary. Yet, when they act in concert, for their mutual interest to cause the subsidiary to provide goods or services at other than arm's length prices, the reality of control exists to at least as great an extent as it did in the Hall case."