Grace CAPPUCCILLI, et al.,
Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent-Appellee.

No. 101, Docket 80–4244.

United States Court of Appeals,
Second Circuit.

Argued Sept. 28, 1981.

Decided Dec. 29, 1981.

Victor Chini, Syracuse, N. Y. (Stanley R. Germain, Syracuse, N. Y., of counsel), for petitioners-appellants.

R. Russell Mather, Atty., Tax Div., Dept. of Justice, Washington, D.C. (John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Daniel F. Ross, Attys., Tax Div., Dept. of Justice, Washington, D.C., of counsel), for respondent-appellee.

Before LUMBARD and VAN GRAAFEILAND, Circuit Judges, and BONSAL,* District Judge.

LUMBARD, Circuit Judge:

Dorothy Cappuccilli, Grace Cappuccilli, Gerald Paduano and Caroline Paduano appeal from a decision of the Tax Court, Tannenwald, J., sustaining income tax deficiencies asserted by the Commissioner for 1970–72, and denying a refund sought by the taxpayers for 1967–69.[1] Some of the deficiencies were based on income from the sale of land by the taxpayers' partnership Cappuccilli, Cappuccilli and Paduano (CCP),

---

* Honorable Dudley B. Bonsal, United States District Judge for the Southern District of New York, sitting by designation.

1. The Commissioner assessed deficiencies of $7,140.13 for 1970, $7,089.58 for 1971, and $69,974.26 for 1972 against Grace Cappuccilli; $7,422.54, $7,467.60 and $71,077.22 for those years against Dorothy Cappuccilli; and $7,590.10, $6,486.68 and $59,895.65 for those years against Gerald and Caroline Paduano. The three taxpayers sought a refund for 1967–69 totalling $201,633.73.

which the taxpayers reported as a capital gain and the Commissioner taxed as ordinary income. Other deficiencies were based on allocation of income under § 482 of the Internal Revenue Code to the partnership from corporations controlled by the partners. The corporations never made cash payments to CCP corresponding to the income allocated by the Commissioner. The taxpayers claim that it was improper to allocate corporate income to the partnership in 1970–72, and that, in any event, the partnership should have an offsetting deduction. The taxpayers further claim a refund for 1967–69 on similar grounds: that corporate income allocated to the partnership in those years was never paid. We affirm the judgment of the Tax Court and sustain the Commissioner, although not entirely for the reasons enunciated by Judge Tannenwald.

The facts were stipulated by the parties or found at trial by Judge Tannenwald, and taxpayers dispute few of those findings on appeal. Brothers Peter and Rocco Cappuccilli and Gerald Paduano each own one third of the partnership bearing their names. (All filed joint tax returns, but as Peter and Rocco filed bankruptcy petitions in 1977, the deficiencies were assessed against their wives.) Their partnership, CCP, bought undeveloped land in the Syracuse, New York area, and sold it on credit, at a paper profit, to Stonehedge Development Corporation, which in turn contracted for development work with Seneca Sewerage Corporation. Each CCP partner owned one third of these corporations until 1969, when Paduano retired and sold his shares to the Cappuccilli brothers. CCP and Stonehedge operated out of the same offices. CCP, Stonehedge, Seneca and the individual partners all used the same lawyer.

Starting in 1955, Stonehedge developed the Seneca Knolls Community in the town of Van Buren, New York. From 1961 to 1962, CCP purchased land adjoining Seneca Knolls—hereinafter the Seneca Farms—for a total of $445,723 and resold it to Stonehedge for a total of $1,570,327.39—consisting of assumption of mortgages, cash and two promissory notes, one for $81,000 yielding six percent interest, and one non-interest bearing note for $1,075,000. On April 15, 1961, CCP purchased a different plot of land from Stonehedge—the Preston Farm—for $25,000, and resold it the next day to Seneca for $40,000—which included a $25,000 promissory note intended to yield six percent. The corporations made payments of principal, but no payments of interest. The Commissioner concluded that the lack of interest recognized by CCP on the notes to the controlled corporations understated the true income of the partnership. Interest income of $325,718.90 was allocated to CCP for 1967–69. At the same time, the Commissioner credited the corporations with a deduction for interest paid to CCP. The allocation was upheld in *Paduano v. Commissioner*, 34 T.C.M. (CCH) 368 (1975), aff'd mem., 538 F.2d 312 (2d Cir.), cert. denied, 425 U.S. 992, 96 S.Ct. 2204, 48 L.Ed.2d 817 (1976).

Zoning problems prevented Stonehedge from developing the land. From 1970 to 1975, Stonehedge was insolvent. In 1970, Stonehedge borrowed $500,000 from Merchants National Bank & Trust Co. on the security of a pending eminent domain claim against New York State, and in 1972 the corporation sold land for $223,756, paying the proceeds to CCP. But from 1970 to 1972, CCP had to advance cash to Stonehedge to keep the corporation going. Stonehedge's debt to CCP for these advances once totalled $120,000. Stonehedge managed to repay these advances, but never paid any interest on them. In 1972, Stonehedge reconveyed part of the Seneca Farms to CCP and CCP foreclosed on the remainder, in full satisfaction of Stonehedge's obligations to the partnership. Because CCP had received payments on the notes while Stonehedge was in possession of the land, CCP recognized gain to the extent of those payments—$482,577—upon repossession under I.R.C. § 1038. CCP reported this gain as capital gain.

In 1975, Stonehedge merged with Community Technology, Inc. (CTI), which filed a Chapter XI bankruptcy petition in 1976, CCP filed a claim for $325,718.90 in interest

allocated by the Commissioner from Stonehedge to CCP, but the bankruptcy court, McGuire, B. J., (W.D.N.Y.), held that under New York law, the Commissioner's allocation imposed no obligation on Seneca or its successor CTI to pay interest to CCP.[2]

■ The Cappuccillis and Paduanos sought a bad debt deduction corresponding to the 1967–69 allocated interest, and therefore claimed a refund. The Commissioner denied the 1967–69 deduction and the refund, and allocated $132,088.70 in interest income from the controlled corporations to CCP for 1970–72. The Commissioner again credited the controlled corporations with a deduction for interest allocated to CCP. The Commissioner further asserted that CCP's gain on repossession of land from Stonehedge was ordinary income, not capital gain. The Tax Court sustained the Commissioner's determinations, and this appeal followed.

The taxpayers' claim for either a bad debt deduction or an ordinary loss deduction is unprecedented, and, we think, unwarranted. Section 482 empowers the Commissioner to allocate income among mutually controlled organizations to reflect their true income. Interest free loans are often used to shift income from organizations with high tax liabilities to those with low tax liabilities. *Latham Park Manor, Inv. v. Commissioner*, 69 T.C. 199, 212 (1977), *aff'd mem.*, 618 F.2d 100 (4th Cir. 1980). The Commissioner here merely determined that CCP's income was understated, and that, as a result, the income of Stonehedge or Seneca was overstated. He placed no obligation on the corporations to pay the partnership. Had CCP wished to receive payments from the corporations reflecting the allocation of income, the partnership could have done so only upon application to the Commissioner and only if the Commissioner determined the interest free loans were not intended to avoid taxes. Rev.Proc. 65–17, §§ 3.02, 4.02, 1965–1 C.B. 833. To allow CCP a deduction now would retroactively cancel the Commissioner's determination of CCP's true tax status in 1967–72. Granting such a deduction could also give taxpayers a windfall. Allocation of income under § 482 is properly offset by the creation of a deduction for the organization from which income was allocated. *B. Forman Co. v. Commissioner*, 453 F.2d 1144, 1156 (2d Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2458, 32 L.Ed.2d 817 (1972); Treas. Reg. § 1.482–1(d)(2). Such a deduction was granted by the Commissioner to Seneca and Stonehedge.[3] Thus taxpayers seek double deductions for § 482 allocations. Neither the law nor common sense supports such an outcome.[4]

The taxpayers argue that the allocation of income to CCP for 1970–72 was improper, either because CCP had no reasonable expectation of receiving interest from the corporations or because Gerald Paduano's sale of stock in the corporations dissolved the common control of CCP and the corpo-

---

**2.** CTI emerged from bankruptcy court in 1977, when a plan of arrangement was approved providing for 100 percent payment of unsecured claims over seven years, and for the subordination of individual Cappuccilli claims.

**3.** The offsetting deductions granted under Treas.Reg. § 1.482–1(d)(2) to Seneca and Stonehedge may be unused if the corporations' successor, CTI, fails to earn income against which the deduction can be applied. But the fact that a § 1.482–1(d)(2) deduction is worthless or unavailable does not preclude allocation of income under § 482, *Continental Equities, Inc. v. Commissioner*, 551 F.2d 74, 78–82 (5th Cir. 1977), and therefore is no reason to void such allocation retroactively by granting CCP a deduction.

**4.** Judge Tannenwald ruled that any "bad debt" corresponding to a § 482 allocation existed only after the Supreme Court had denied certiorari in 1976—and therefore the taxpayers' assertion of a 1976 deduction was not timely for offsetting taxes paid 1967–69. Given our analysis of the "bad debt" deduction, we need not reach the issue of timeliness. We would note, however, that the analysis of the tax court would preclude direct appeal of taxpayers' claim for a "bad debt" deduction for 1970–72. The Supreme Court would have to deny certiorari on the decision herein on the § 482 allocation for 1970–72 before we could consider any offsetting "bad debt" deduction based on that allocation. The tax court did not consider taxpayers' claims for a bad debt deduction for 1970–72.

rations. In both instances, taxpayers challenge findings of fact by the tax court. In neither instance are the findings clearly erroneous. Judge Tannenwald's finding that CCP did have a reasonable expectation of receiving interest was based on Stonehedge's receipt of a $500,000 loan from Merchants National Bank & Trust Co., on Stonehedge's sale of land to a third party for $233,756, and on Stonehedge's ability to repay CCP for its cash advances. Judge Tannenwald further found that common control of CCP and the corporations existed in 1970–72 because the interest-free notes represented a common control method of income shifting that predated Paduano's retirement and continued afterwards. This finding comports with the rule in this circuit that the realities of control, rather than record ownership, determine the application of § 482. *B. Forman Co., supra*, 453 F.2d at 1153–4. If the owners of one organization differ from the owners of another, the two may still be held to be under common control if they are in fact run by the same people. *Collins Electrical Co., Inc. v. Commissioner*, 67 T.C. 911, 918–19 (1977). Clearly, the Cappuccilli brothers ran CCP, Seneca and Stonehedge.

■ There remains the question of whether CCP's gain on repossession of Stonehedge's land was capital gain or ordinary income. The character of gain on repossession under § 1038 is determined by the character of the original sale. Treas.Reg. § 1.1038–1(d). Therefore the question is whether CCP in 1962 sold land in the ordinary course of business. I.R.C. § 1221(1). Two decades ago, the IRS taxed CCP's gain from the sale of land in 1957–58 as the sale of ordinary assets yielding ordinary income. CCP did not challenge the IRS. Now the Commissioner again asserts that CCP was, during 1961–62, in the business of buying and selling real estate. CCP assembled the Seneca Farms in purchases from February 22, 1961 through January 3, 1962. CCP drew up papers for resale of the land in late 1961 and early 1962. The closing was to occur on January 10, 1962, only a week after the last of the farms had been purchased. The closing was delayed until December 28, 1962 only because the partners became concerned about rezoning the land for development. The gains from this turnover of real estate were clearly " 'the profits and losses arising from the everyday operation of a business' " rather than " 'the realization of appreciation in value accrued over a substantial period of time,' " *Malat v. Riddell*, 383 U.S. 569, 572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966). Petitioners' only evidence to the contrary was the assertion by Peter Cappuccilli that CCP purchased the land for either speculation or investment. On this record, such an assertion is insufficient to carry petitioners' burden of proof in challenging the Commissioner's determination that CCP's gain was ordinary income.[5]

Affirmed.

VAN GRAAFEILAND, Circuit Judge, concurring:

Because appellants' attorneys have proceeded in this matter as if their clients' interests were identical, I concur in the result reached by my colleagues. Had counsel seen fit to distinguish the merits of the Paduano claim from those of the other appellants, I would find affirmance of that claim more troublesome.

In May 1969, Mr. Paduano relinquished all of his interest in Stonehedge Development Corporation and Seneca Sewerage Corporation. The only evidence presented in the Tax Court indicated that, although Paduano remained a nominal partner in CCP, he in fact retired from active participation in that partnership. Despite these undisputed facts, Mr. and Mrs. Paduano.

5. Judge Tannenwald found that the interrelationships between CCP, Stonehedge and their owners created a "joint venture" of sorts. As taxpayers conceded that Stonehedge was in the business of buying and selling real estate, Judge Tannenwald ruled that CCP as a joint venturer was, through Stonehedge, also in the business of buying and selling real estate. Given our analysis of CCP's business, we need not consider the joint venture theory enunciated by the tax court.

142

have been held liable to pay a tax on nonexistent income allocated from the corporations to the partnership and which, of course, the Paduanos never received.

When actual partnership income is involved, the law is clear that each partner must pay a tax on his distributive portion of that income. *United States v. Basye*, 410 U.S. 441, 448, 93 S.Ct. 1080, 1085, 35 L.Ed.2d 412 (1973). However, "[t]hat which is not in fact the taxpayer's income cannot be made such by calling it income." *Hoeper v. Tax Commission*, 284 U.S. 206, 215, 52 S.Ct. 120, 121, 76 L.Ed.2d 248 (1931). Taxable income contemplates the existence of an economic benefit which is subject to the dominion and control of the taxpayer. *Commissioner v. Kowalski*, 434 U.S. 77, 83, 98 S.Ct. 315, 319, 54 L.Ed.2d 252 (1977); *Commissioner v. First Security Bank*, 405 U.S. 394, 403, 92 S.Ct. 1085, 1091, 31 L.Ed.2d 318 (1972). Because the Paduanos had no interest in or control over the corporations during the taxable years in question and derived no benefit whatever from the interest-free loans to those entities, the allocation of income from the corporations to the Paduanos has constitutional implications which are bothersome. Although courts look upon tax legislation with an indulgent eye, a levy which is so arbitrary and capricious as to amount to confiscation may be held to violate the Fifth Amendment. *Heiner v. Donnan*, 285 U.S. 312, 326, 52 S.Ct. 358, 361, 76 L.Ed. 772 (1932); *Nichols v. Coolidge*, 274 U.S. 531, 542, 47 S.Ct. 710, 713, 71 L.Ed. 1184 (1927).

Because this issue has been neither briefed nor argued, I discuss it only to indicate my belief that the Commissioner's power of allocation under section 482 is not without constitutional limitations.