CRANE AND TRACTOR PARTS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JACK D. ALEXANDER and NELMA L. ALEXANDER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Crane & Tractor Parts, Inc. v. Commissioner
Docket Nos. 26515-82, 26560-82.
United States Tax Court
T.C. Memo 1984-510; 1984 Tax Ct. Memo LEXIS 161; 48 T.C.M. (CCH) 1207; T.C.M. (RIA) 84510; September 25, 1984. E. J. Ball and Kenneth R. Mourton, for the petitioners. William P. Hardeman, for the respondent. FEATHERSTON MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the Federal corporate income tax of petitioner Crane and Tractor Parts, Inc., for the taxable year ended June 30, 1978, in the amount of $10,676.41. Respondent alsodetermined deficiencies in the joint Federal income tax of petitioners Jack B. Alexander and Nelma L. Alexander, as follows: Year
Deficiency
1975
$17,617.00
1976
122,204.39
1977
396,911.02
1978
300,581.38
Other issues having been settled, the ones remaining for decision are as follows: 1. Whether respondent's adjustment to the useful life of certain construction equipment of TAW, Inc., a subchapter S corporation, *163 for 1977 and 1978, was erroneous; 2. Whether respondent's adjustment to the salvage value of certain construction equipment of TAW, Inc., a subchapter S corporation, for 1977 and 1978, was erroneous; 3. Whether the gain on sales of equipment by petitioner Crane and Tractor Parts, Inc., in 1977 and 1978, should be reallocated to petitioner Jack D. Alexander's wholly owned subchapter S corporation under section 482; [1] and 4. Whether any loss arising in petitioner Crane and Tractor Parts, Inc.'s, taxable year ended June 30, 1977, as a result of the Court's disposition of the disputed adjustments may be carried forward to the company's succeeding taxable year. FINDINGS OFFACT Petitioners Jack B. Alexander and Nelma L. Alexander were legal residents of Fort Smith, Arkansas, at the time their petition was filed. Their joint Federal income tax returns for the years in issue were filed at the Austin Service Center, Austin, Texas. For convenience, Mr. Alexander will be referred to as petitioner. During the period before the Court, petitioner was the president *164 and sole shareholder of a subchapter S corporation named TAW, Inc. (TAW). The company's principal business activity was building access roads and preparing drilling sites for oil and gas wells in Arkansas and neighboring states. Petitioner Crane and Tractor Parts, Inc. (Crane), is a New Mexico corporation. At the time its petition was filed, its principal place of business was in Hutchins, Texas. Its Federal corporate income tax return for fiscal 1978 was filed at the Austin Service Center, Austin, Texas. Petitioner had been a 50-percent owner of Crane for some years prior to November 18, 1976. Prior to July 1, 1976, Crane's records show that its inventory consisted only of salvage machinery parts; it had no inventory of used equipment held for sale. On November 18, 1976, petitioner acquired a 100-percent ownership interest in Crane. Almost immediately thereafter, on December 16, 1976, Crane began buying used equipment from TAW and others for resale. Although he possessed a controlling interest in Crane, petitioner did not participate in the day-to-day management of the company. Instead, he devoted himself almost entirely to the management of TAW. TAW's operations *165 were carried out with Caterpillar earthmoving equipment which it acquired from three principal dealers, J.A. Riggs Tractor Co. (Riggs), Boecking Machinery, Inc. (Boecking), and Albert Equipment Co., Inc. (Albert). The equipment was acquired through lease contracts which gave TAW on option to purchase the equipment. The record includes typical lease contracts with each of the three suppliers listed above. the option to purchase under the Riggs contract could be exercised at any time; the option under the Boecking contract could be exercised at any time after 6 months from the date of the contract; and the option under the Albert contract could be exercised at any time after one month from the date of the contract. In the event that the option to purchase was exercised, the lease payments that had been made prior to the exercise date were converted into mortgage payments, adjusted for interest during the period prior to exercise of the option. The lease contracts contained amortization schedules showing the amounts of the lease payments to be allocated to principal and interest if the options to purchase were exercised. The lease contracts also provided for a discount for a cash *166 payment of the option balance, 10 percent discount in the case of Riggs, 9 percent in the case of Albert, and 8 percent in the case of Boecking. Most of the equipment acquired under these lease contracts was kept by TAW for a period of 12 to 20 months.The terrain on which TAW used the equipment ranged "from the very worst imaginable to the very easiest." [2] During the years in issue, the equipment was always used long hours, sometimes around the clock. At the worksites, petitioner's crews were unable to perform extensive maintenance on the equipment. They found it impractical to set up maintenance shops. [3] TAW used the new equipment only until "it got to causing trouble or down time" and then disposed of it. *167 Prior to 1975 or 1976, TAW followed the practice of charging all payments under its equipment leases to expense. Petitioner was advised by his accountants, however, that the correct procedure would be to capitalize the equipment and then depreciate it, asif it were being purchased rather than leased, and this is the practice which was followed during the years in issue. It is uncontested that this treatment was correct. On its income tax returns, TAW claimed depreciation and investment tax credit based on a 3-year useful life for the machinery and a salvage value equal to 15 percent of its cost. TAW exercised its option to purchase 17 pieces of leased equipment during the period in issue, 12 of which had been obtained from Riggs and five of which had been obtained from Albert. Of the 12 tractors which were acquired from Riggs, TAW sold four to Crane, which resold them back to Riggs shortly thereafter. The following table gives the dates and prices of the sales: Sale from Riggs to TAW
Upon Exercise of Option
Sale from TAW to
Sale from Crane and
to Purchase
Crane and Tractor
Tractor to Riggs
Date
Price
Date
Price
Date
Price
3/04/77
$13,248
3/11/77
$25,000
4/15/77
$50,000
4/21/77
29,296
4/28/77
40,000
[1] 4/15/77
50,000
4/21/77
20,240
6/02/77
20,000
11/04/77
42,500
4/21/77
18,160
6/02/77
20,000
6/27/77
44,000
*168 In addition to buying equipment from TAW which that company had acquired under options to purchase, Crane also bought equipment directly from Riggs, Albert, and Boecking which had previously been leased to TAW and on which TAW held its options to purchase.There were 15 such purchases during the period in question. [4] Crane then sold the equipment back to theoriginal lessor or to other unrelated third parties. The dates and prices of the sales are as follows: Additional Costs Incurred
Sale by Crane and
Sale to Crane and Tractor
by Crane and Tractor
Tractor to Third Parties
Date
Price
Date
Price
7/26/77
$ 38,865
$5,842
8/23/77
$ 64,000
10/07/77
24,448
474
11/04/77
42,500
9/16/77
45,701
9/20/77
74,000
3/01/78
7,659
693
3/20/78
30,000
2/06/78
35,339
910
2/27/78
57,625
1/31/78
40,544
2/21/78
50,000
1/31/78
30,434
2/20/78
71,000
2/13/78
48,237
293
2/27/78
57,625
3/01/78
30,992
3/17/78
69,500
2/06/78
43,029
499
2/27/78
57,625
4/27/78
24,762
4/28/78
54,930
2/01/78
46,200
509
2/27/78
57,625
6/06/78
38,126
6/05/78
62,500
6/06/78
37,101
6/05/78
62,500
1/18/78
40,500
5/19/78
43,000
Total
$531,937
$9,220
$854,430
*169 Crane reported a net operating loss of $55,830 for its taxable year ended June 30, 1976, and, after carrying back $24,113 to the prior year, $31,717 remained to offset future income. For the taxable year ended June 30, 1977, the company reported a net operating loss of $72,024 which, when combined with the loss carryover of $31,717 from the prior year, produced a net reported loss of $103,741. Operations for the year ended June 30, 1978, produced income of $157,608, which was offset in part by the carryover of the preceding years' losses. As noted above, petitioner's ownership of Crane increased from 50 percent to 100 percent on November 18, 1976. During the period from July 1, 1976, until November 18, 1976, TAW sold three pieces of equipment to unrelated third parties at a total reported gain of $105,000. After November 18, 1976, TAW stopped selling equipment to third parties and dealt only with Crane. Respondent determined that TAW's heavy equipment had a useful life of 16 months and a salvage *170 value equal to 60 percent of its cost rather than a useful life of 3 years and a salvage value of 15 percent of cost as claimed by petitioner. Respondent also determined that although the equipment described above was, in form, sold to third parties by Crane, TAW was the true seller as a matter of economic substance. Accordingly, respondent reallocated to TAW the gains ($129,630.10 in fiscal 1977 and $78,616.23 in fiscal 1978) from the sales pursuant to section 482. Respondent's determination allows Crane a 10-percent commission on the sales it is viewed as having transacted on behalf of TAW. OPINION 1. Depreciation and Investment Credit
Section 167(a) provides for the deduction of a reasonable allowance for the depreciation of property used in a trade or business. [5] TAW used the straight line method of computing depreciation on its construction equipment, "Under the straight line method the cost or other basis of the property less its estimated salvage value is deductible in equal annual amounts over the period of the estimated useful life of the property." Section 1.167(b)-1(a), Income Tax Regs. *171 The annual allowance may be computed by dividing the adjusted basis of the property at the beginning of the taxable year, less salvage value, by the remaining useful life of the property at such time. Under this formula for computing the depreciation deduction, two important factors are here in dispute: the useful life of the property and its salvage value. The useful life of the property is important in this case not only for the computation of the depreciation deduction but also for the determination of petitioner's eligibility for the investment credit on TAW's construction equipment. Section 48(a)(1) limits the credit to depreciable property "having a useful life (determined as of the time such property is placed in service) of *172 3 years or more." a. Useful Life
The useful life of an asset for purposes of depreciation is-- not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. Sec. 1.167(a)-1(b), Income Tax Regs. The same regulation provides further that: This period shall be determined by reference to his [the taxpayer's] experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * As explained in Massey Motors, Inc. v. United States,364 U.S. 92, 107 (1960), *173 the useful life of an asset is "related to the period for which it may reasonably be expected to be employed in the taxpayer's business," not necessarily its abstract economic life or its functional or physical life. Petitioner's wholly owned subchapter S corporation, TAW, acquired earth-moving equipment during the years in question which it typically disposed of, as a matter of policy, after a period of 12 to 20 months. The machinery was held for this relatively short period because petitioner's crews, working in remote areas frequently on difficult terrain, under deadlines and often under conditions which made significant repair or maintenance impractical, required reliable equipment. As explained by petitioner, "we always work 12 hours a day, and many times we'll work 24, seven days a week." The intense, demanding use made of machinery soon brought it below TAW's standard of reliability. Having the "kind of shop you need and the kind of personnel you need" to do extensive repair work would have been prohibitive. For these reasons, TAW followed a policy of disposing of equipment when it was no longer reliable. [6]
*174 For depreciation and investment tax credit purposes, petitioner claimed that the equipment in question had a useful life of 3 years. Respondent has determined that the useful life of the equipment was 16 months. We agree with respondent. The only evidence offered by petitioner in support of the claimed 3-year useful life is his own estimate and the general testimony of the general sales manager of Riggs, a construction equipment dealer. These estimates and testimony were not based on any specific factual data but on the witnesses' stated opinion. There is no indication that they took into account the intense use given TAW's machinery or the difficult terrain where it was used. Respondent's 16-monthuseful life, on the other hand, is based on the actual experience of petitioner during, and preceding, the years in question. [7]
*175 Petitioner argues that respondent is engaging in hindsight by basing his determination on the events of the period in question rather than on the information available to petitioner at the beginning of the period, when he made his original estimate of a 3-year useful life. This action, petitioner argues, contradicts the statement of this Court that: Clearly, any estimation of useful life which makes use of hindsight does not provide an appropriate basis upon which to make a redetermination. Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 668 (1980). We do not agree that respondent has resorted to hindsight in the present case. That is, respondent has not used the events of the years before the Court to overturn an estimate shown to have been reasonably based on the events of comparable prior years. As shown in footnote 7, supra, respondent relied on TAW's actual practice and experience in the fiscal years 1975, 1976, and 1977 as found by the engineer agent. One of those fiscal years preceded all of TAW's taxable year 1977 and two of them preceded *176 all of its taxable year 1978. We think the weighted average useful life found by the engineer agent is thus a reasonable estimate of the equipment's useful life, and such estimate could have beenmade by petitioner in the light of objective facts which existed when the equipment here in dispute was placed in service. Petitioner criticizes respondent for failing to consider the records of earlier years (1971-1974), but petitioner has himself produced no such records tending to indicate that the estimate of a 3-year useful life was reasonable when made for the years here in issue. We infer that, had these records been produced, they would not have supported petitioner's contention. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). In fact, petitioner testified, as our findings reflect, that TAW expensed the rent under the equipment leases until 1975 or 1976; at that point, on advice of his accountants, TAW began capitalizing and depreciating the equipment. Also, petitioner's criticism fails to take into account his own testimony that in 1974, the first half of which preceded the *177 period covered by the engineer agent's analysis, the country was having a "bad time" and the economy was "down"; then "one day we got up and decided we didn't have enough natural gas or enough oil." The "energy crises" caused a tremendous increase in TAW's business of building access roads and preparing for drilling sites of oil and gas wells. Petitioner's criticism gives no effect to TAW's intensive use of its equipment in its fiscal years 1975, 1976, 1977, and 1978 resulting from these changed economic conditions in the oil and gas drilling industry even though those changed conditions were known when petitioner acquired the equipment in question. b. Salvage Value
The second important factor in computing the depreciation deduction here in dispute, as indicated above, is salvage value, which is defined as-- the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. *178 Sec. 1.167(a)-1(c)(1), Income Tax Regs. The same regulation provides further that: The time at which an asset is retired from service may vary according to the policy of the taxpayer. If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large proportion of the original basis of the asset. However, if the taxpayer customarily uses an asset until its inherent useful life has been substantially exhausted, salvage value may represent no more than junk value. See also Massey Motors, Inc. v. United States,supra at 107. In computing TAW's depreciation deductions with regard to the equipment here in question, petitioner claimed a salvage value equal to 15 percent of the equipment's cost. Respondent redetermined the equipment's salvage value as 60 percent of its cost. Respondent's redetermination is supported by an analysis of TAW's dispositions of its equipment during the fiscal years 1975, 1976 and 1977, which shows that TAW realized amounts varying from 51 to 94 percent of the original purchase price on disposition of its equipment. *179 [8] As with respect to the useful life issue, we think that these figures based on actual experience show the estimates offered by petitioner to be unrealistic and support the figure determined by respondent. Our view in this regard is supported by the testimony which shows that, due to improved economic conditions, the salvage value of used equipment was considerably greater in 1976, 1977 and 1978 than in 1973, 1974, and 1975. It is also supported by petitioner's own description of TAW as requiring reliable equipment with very little "down" time in order to complete its jobs on schedule. The fact that, as a matter of "policy," using the word of the above-quoted regulation, equipment was disposed of as soon as it fell below TAW's necessarily high standard of reliability is consistent with the relatively short holding period and high salvage value determined by respondent. *180 2. Reallocation of Gain on Sale of Equipment
Section 482[9] empowers the Secretary of the Treasury to reallocate income among commonly controlled entities in order to prevent the evasion of taxes or clearly to reflect the income of the entities. As this Court has stated: In order to prevent the artificial shifting of income from one related business to another, section 482 places a controlled taxpayer on a parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true net income of a controlled taxpayer. * * * Thus, income which has been artificially diverted to one member of a controlled group but which in fact was earned by another member of the group may be "allocated" by the Commissioner under section 482 of the entity which really earned it. [Citations omitted.] Huber Homes Inc. v. Commissioner,55 T.C. 598, 605 (1971); Liberty Loan Corp. v. United States,498 F.2d 225, 229 (8th Cir. 1974); Latham Park Manor, Inc. v. Commissioner,69 T.C. 199, 210 (1977), *181 affd. without published opinion, 618 F.2d 100 (4th Cir. 1980). See also sec. 1.482-1(b)(1), Income Tax Regs. Respondent has determined that such a reallocation is necessary in the present case in order to prevent the shifting of income from TAW to Crane. That determination may be ooverturned only if it is shown by petitioner to be "unreasonable, arbitrary, and capricious." Wilson v. United States,530 F.2d 772, 776 (8th Cir. 1976), and cases cited; Liberty Loan Corp. v. United States,supra at 229. We hold that petitioner has not made the requisite showing. *182 Both TAW and Crane were wholly owned by petitioner during the years in controversy [10] and thus were clearly "owned or controlled directly or indirectly by the same interests" within the meaning of the statute. In addition, in the four instances listed in our findings, TAW sold equipment to Crane at prices well below its fair market value, as evidenced by the substantial gains realized by Crane on the resales of the equipment very shortly after it was acquired. In some cases the resale price was over twice the amount paid by Crane to TAW to acquire the equipment. TAW's sales to Crane at less than fair market value obviously had the effect of "milking" TAW, the subchapter S corporation, to the financial advantage of Crane and to petitioner's tax advantage. *183 Respondent also points to the gains realized by Crane on the 15 sales, listed in our findings, of equipment which had been previously leased to TAW and with respect to which TAW, not Crane, had an option to purchase. The equipment was soon resold at a profit in every case, sometimes at a very substantial profit and sometimes to the same lessor/seller from whom it had been purchased by exercise of the options shortly before. Respondent asks us to infer that the reason Crane was able to acquire the equipment at prices far below its fair market value as reflected in the subsequent sales was that, in making the acquisitions, Crane was, in substance, exercising the favorable options to purchase contained in TAW's leases. We find this inference a reasonable one; petitioner has produced no more convincing explanation of why the equipment could be resold so quickly and profitably, often back to the original seller. It is significant that Crane paid no tax on these gains to the extent that they were offset by its net operating losses of prior years. We think respondent's determination that petitioner sought to channel gain from TAW to Crane in order to attempt to take advantage *184 of a lower tax cost is supported by the evidence. The reallocation of the gain between the two corporations was, therefore, within the scope of the authority granted by section 482 to reallocate gross income and deductions among commonly controlled businesses clearly to reflect income based "arm's length" dealing. Wilson v. United States,supra at 777; Liberty Loan Corp. v. United States,supra at 229. Petitioner argues that respondent has failed to consider the cost of parts, labor, or transportation incurred by Crane in reselling the equipment. Respondent has, however, taken into account such additional costs incurred by Crane as he was able to identify, as shown in the table set forth in our findings. Petitioner has failed to introduce evidence supporting specific costs in higher amounts. Petitioner argues further that, if Crane is found to have sold the equipment on behalf of TAW, as respondent has determined, more of the proceeds of the sales should be credited to Crane as commission income than the 10 percent respondent has allowed. We find, however, that the 10 percent allowed by respondent is reasonable in the light *185 of the evidence in this case. In other words, petitioner has failed to prove that a higher figure would be more appropriate. [11] Petitioner also argues that "respondent's revenue agent erred in the method employed in determining an arm's length price under Section *186 482." Section 1.482-2(e)(1)(i), Income Tax Regs., provides that, when tangible property is sold by one controlled entity to another at "other than an arm's length price," respondent may "make appropriate allocations between the seller and the buyer to reflect an arm's length price for such sale or disposition." A hierarchy of methods is provided to determine an arm's length price: the comparable uncontrolled price method, the resale price method, and the cost-plus method. The comparable uncontrolled price method is deemed the most reliable, and is to be used whenever there are "comparable uncontrolled sales." Sec. 1.482-2(e)(2)(ii), Income Tax Regs. "Uncontrolled" sales are "sales in which the seller and the buyers are not members of the same controlled group." The uncontrolled sales are "comparable" to controlled sales-- if the physical property and circumstances involved in the uncontrolled sales are identical to the physical property and circumstances involved in the controlled sales, or if such properties and circumstances are so *187 nearly identical that any differences either have no effect on price, or such differences can be reflected by a reasonable number of adjustments to the price of uncontrolled sales. Sec. 1.482-2(e)(2)(ii), Income Tax Regs. In making the reallocation in the present case, respondent used the resale price method [12] rather than the comparable uncontrolled price method. Petitioner argues that this was improper because "there were in fact comparable uncontrolled sales." We do not agree with petitioner. The "comparable uncontrolled sales" relied upon by petitioner fall into two categories. The first consists of offers of sale by Riggs to dealers other than Crane allegedly at the same price that Crane was offered. These offers do not constitute "uncontrolled sales" within the meaning of the applicable regulation, which clearly contemplates completed transactions rather than mere offers. The second category consists of equipment sold by Riggs to purchasers other than Crane and bought by Crane from sellers other than Riggs. Petitioner has failed *188 to demonstrate that these transactions, either, were "comparable uncontrolled sales." The record contains no information which would support a finding that the equipment involved in the sales relied upon by petitioner was "identical" or "nearly identical" to the equipment concerned in the controlled sales as provided by section 1.482-2(e)(2)(ii), Income Tax Regs., quoted in pertinent part above. Indeed, there is no description at all of the property involved in the uncontrolled sales or any details or documentation of the prices at which it was sold; the argument rests solely on the assertion that sales to and purchases from other companies were made. Because the condition of one item of used equipment may vary greatly from the condition of any other item, the record's silence in this respect is a fatal defect in petitioner's argument. 3. Net Operating Loss Carryforward
Petitioner argues that, if respondent's reallocation of income away from Crane for its taxable year ended June 30, 1977, increases the net operating loss which the company reported for that year, the loss should be carried forward to the following year to reduce the deficiency *189 determined by respondent for that year. Respondent argues that petitioner has failed to show that any loss for Crane's 1977 taxable year was not consumed by the income of prior years. Net operating losses must generally be carried back and applied against the income of the 3 preceding years before they can be carried forward. [13]Sec. 172(b)(1)(A). As noted above, Crane reported a loss of $55,830 for its taxable year ended June 30, 1976, and carried $24,113 of that amount to the preceding year. While the record does not reveal Crane's reported income or losses for years prior to fiscal 1976, its treatment of its loss for that year was correct only if the $24,113 carried back to fiscal 1975 offset all of the income of the 3 preceding years. Respondent has not challenged the correctness of Crane's treatment of the loss for fiscal 1976, and that treatment is inconsistent with the existence of any income in fiscal 1974-1976 not already offset by the 1976 carryback. Accordingly, it appears that any loss arising in fiscal 1977 as a result of our disposition of respondent's reallocation *190 of income away from Crane may be carried forward to the company's succeeding taxable year. The details of the computation should be worked out in connection with the Rule 155 computation. To reflect the foregoing, and other issues resolved by the agreement of the parties, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. As petitioner related: Some of the land we are working in is good alluvial soil, clay types that there's no wear and tear; and we go into the mountains where it's just absolutely horrible. You could just about trail a tractor by the string of bolts that vibrated and jolted out of it. Sometimes we're in a swamp. I've seen swamps where you could take a posthole digger and dig a whole [sic] five feet deep and before you got the posthole digger out it would be full of water. ↩
3. As petitioner explained: There wasn't anyplace you could put one [maintenance shop] where it was always in the right place. You might be one place today and tomorrow be 300 miles away. And to have the kind of shop you need and the kind of personnel you need, it would have been prohibitive to have one everywhere you need one. * * * [T]he one thing we could control, you changed the oil and the filters in them regularly. Tried to follow the prescribed regular maintenance of CAT, as far as lubrication, and the operator was required to keep his tractor up as best he could in the remote areas that he worked, but they hired on as operators, not as mechanics.↩
1. The dates given are the dates payment was made. In these and some other instances, payment was received for the resale of the equipment before it was made for the original purchase.↩
4. The exhibit showing these purchases lists 16 sales invoices but two of them appear to be duplicates. Invoice # M823 and Ser. No. 977L-11K6615 is listed twice.↩
5. SEC. 167. DEPRECIATION (a) General Rule.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business, * * *↩
6. The general sales manager of Riggs testified: Q Do you know what period of time, on the average, TAW held the equipment under the lease contract? A Well, I'm going--I believe as far as I can remember, most of theirs was returned from a period of about, it seems to me like, 12 months to about 18 or 20 months. Normally they'd return the equipment when it got to the point they couldn't use it.↩
7. The Internal Revenue Service Valuation Engineer's report, stipulated in evidence, summarizes the facts as follows: A detailed analysis was made of the acquisition and disposition of heavy equipment acquired in the [fiscal] tax years * * * [1975, 1976 and 1977]. These anyalyses indicate that TAW's past operation was to sell their heavy equipment after 25.060 months in * * * [1975], 15.210 months in * * * [1976], and 14.065 months in * * * [1977]. The weighted average useful life over this 3-year period was 15.17 months. Also, in this 3-year period of time, the analysis shows that the equipment sold by TAW, Inc., was again resold at values of from 51 percent to 94 percent of TAW's original purchase price.↩
8. See fn. 7, supra. In this analysis, respondent has treated the equipment sold to Crane and subsequently resold by it as having been sold directly to third parties by TAW. That is, the resale price realized by Crane has been regarded as the amount TAW realized on disposition of the equipment. This is consistent with respondent's view with regard to the sec. 482↩ issue which we discuss below.
9. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩
10. As noted above, petitioner's interest in Crane increased from 50 percent to 100 percent on November 18, 1976, and petitioner owned 100 percent of TAW throughout the period in question. The notice of deficiency issued to petitioner covered his taxable years 1975 through 1978, but respondent's reallocation of income to TAW, and thus to petitioner, involved only petitioner's taxable years 1977 and 1978. Thus, petitioner was the sole owner of both corporations during the period relevant to the sec. 482↩ issue.
11. Petitioner attempts to justify a 25 to 30 percent commission but the testimony on which he relies for that percentage related to the repair and resale of used machinery by another company. Petitioner's witness testified: Q Mr. Harrison, in cross you stated that if you bought a piece of equipment in and you couldn't sell it immediately to another wholesale, wholesale equipment dealer, that your company would then fix it up and add the fixing up cost on it and then add a profit if you had to sell it? A That's correct. Q What's the standard profit in the industry * * *? * * * A Normally when I take a used machine in and have to put it in my shop for repair for resale, I normally try to make 25 to 30 percent. Crane was not shown to have made substantial repairs on the equipment in issue. The minimal additional costs incurred by Crane, shown in our findings, indicate that it did not do so.↩
12. This method is described in sec. 1.482-2(e)(3), Income Tax Regs.↩
13. If a special election is made by the due date of the tax return for the loss year, the carryback may be relinquished and the loss carried forward directly. Sec. 172(b)(3)(C)↩. It does not appear that such an election was in effect in the present case.